IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN STEAMSHIP OWNERS :
MUTUAL PROTECTION AND :
INDEMNITY ASSOCIATION, INC. :
    v. : CIVIL NO. CCB-08-2195
     :
DANN OCEAN TOWING, INC., et al. : **IN ADMIRALTY**
     :

...o0o...

## MEMORANDUM

Now pending before the court are cross-motions for summary judgment filed by the plaintiff, American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club" or the "Club"), and the defendants, Dann Ocean Towing, Inc. and its subsidiary, Dann Towing Company (collectively "DOT"). American Club has sued the defendants for breach of a marine insurance contract it issued to them, and the defendants have counterclaimed for breach of the same contract. The motions have been fully briefed and no oral argument is necessary. For the reasons set forth below, American Club's motion will be granted in part and denied in part, and DOT's motion will be denied.

## BACKGROUND

This case arises out of a marine insurance contract between American Club and DOT. American Club is a non-profit mutual protection and indemnity ("P & I") association that provides marine insurance to ship owners, their managers, and charterers against third-party liabilities encountered in their commercial operation of vessels. DOT is a company that manages and operates a fleet of tugboats, including the Tug Captain Dann. Dann Towing Company is the owner of the Tug Captain Dann. Previously, this court granted American Club's motion to arrest the Tug Captain Dann and to attach its contents. This court also denied DOT's subsequent

motion to quash, vacate, and set aside maritime attachment and garnishment of the Tug Captain Dann.  This lawsuit was filed on August 21, 2008.

American Club provided marine insurance to DOT and its vessels until 2001.  DOT first became a member of the Club on August 8, 1995.  DOT re-applied for membership in 1996, and remained a member through 2001.  American Club issued a Certificate of Entry to DOT on February 20, 1997, which was renewed annually thereafter.   The Certificate of Entry reflects the insurance contract between the parties, and states that it is "subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed thereon."  (Pl.'s Summ. J. Mem. Ex. 1 at 1.)

I.     Tug Allie B Settlement

Many of the facts in this case are difficult to glean from the record before the court.  It is clear, however, that American Club argues DOT breached the contract between them in two ways.  The first arises out of an accident that occurred in July 1998 involving the Tug Allie B, operated by DOT.  The Tug Allie B was towing a barge owned by Allied Towing, Inc. ("Allied") when it grounded on a coral reef in Biscayne National Park in Florida.  As a result, the United States sued the Tug Allie B and its operator, DOT, seeking compensatory damages for the injury done to the reef; Allied also sued seeking compensatory damages for the harm done to the barge. American Club provided a defense and indemnification related to the claims.  DOT's liability was uncontested, and a settlement was reached in November 2001 for a total of $2,170,000 ($1,070,000 to the United States and $1,100,000 to Allied).

The claims brought by the United States were covered under American Club's P & I policy, while American Club provided excess insurance for the claims brought by Allied. With regard to Allied's claims, the Club argues that pursuant to Club Rule 1 § 11 it was only required

to fund any amount in excess of $1 million, which was the stated limit for DOT's collision and tower's liability insurance with St. Paul Fire & Marine and following underwriters.[1] (*See* Moore Aff. ¶ 9.) It is uncontested that one of the underwriters for DOT's collision and tower's liability insurance, HIH International ("HIH"), went into receivership and could not pay its portion of the settlement, an amount totaling $278,552.55 (the "shortfall").[2] DOT refused to pay this portion of the settlement and claimed that American Club should do so. The Club, however, denied any responsibility for the shortfall, arguing that it should be paid by bankrupt HIH or by DOT. Ultimately, American Club paid the shortfall in December 2001. It states that it did so to preserve "an extremely favorable settlement", as the claims against DOT were valued at more than $5,000,000. (*Id*. at ¶ 10.) American Club paid the shortfall amount in addition to $1,170,000 in excess of the underlying insurance. (*Id*.)

According to American Club, DOT is legally responsible for the shortfall amount. The parties agree, however, that in a letter dated November 16, 2001, DOT agreed that the Club would "advance" the shortfall, but refused to acknowledge any responsibility to reimburse the

---

[1] Club Rule 1 § 11 provides in relevant part:

> The Association shall not be liable for any loss, damage, or expense against which, but for the insurance herein provided, the Member is insured under existing insurance, except as set forth above [dealing with pollution insurance]; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above; nor will this insurance replace any other insurance where (for whatever reason) that other insurance does not or is not able to respond to a claim thereunder.

(Pl.'s Summ. J. Mem. Ex 2 at 22.)

[2] DOT learned that HIH would be unable to pay its share of the settlement in October 2001. DOT does not contest the accuracy of evidence presented by American Club, however, that HIH stopped paying all claims on March 16, 2001. (*See* Pl.'s Reply Ex. C at 4.)

Club.[3] (*See* Dann Aff. ¶ 13 & Ex. F; Moore Aff. ¶ 10.) The record shows that the parties reserved all rights with respect to the legal responsibility for the shortfall. (*See* Solarino Dep. Ex. 4 & 6.) Following American Club's payment of the shortfall, the parties were unable to reach an agreement as to the terms of DOT's repayment, if any. As a result, on January 22, 2003, American Club began offsetting DOT's claims for reimbursement against the shortfall.[4] (*See* Moore Dep. Ex. 1 at 2.) American Club argues that these offsets were authorized by Club Rule 4 § 8, which provides that "[t]he Association shall be entitled to set off any amount due from a Member against any amount due to such Member from the Association." (Pl.'s Summ. J. Mem. Ex. 2 at 48.) But DOT contends that American Club began offsetting the shortfall amount unilaterally and without notice. In total, American Club offset $131,085.43 in claims otherwise payable as indemnity to DOT.[5] (Moore Aff. ¶ 14.) The Club argues, therefore, that it is owed a balance of $147,467.12, plus interest.

---

[3] American Club attempted to have DOT sign a loan agreement, but DOT refused. (*See* Defs.' Reply Ex. A.)

[4] Although American Club's original memorandum cites the affidavit of Donald R. Moore, who is a Vice President and claims manager for the company that manages American Club, for the proposition that the Club began offsetting against the Allie B shortfall in May/June 2002 (*see* Moore Aff. ¶ 11), American Club's reply memorandum states instead that the Club began to discuss offsetting DOT's claims in June 2002, but in fact did not do so until January 22, 2003. (*See* Pl.'s Reply at 11.) DOT does not dispute that the first offset payment occurred on January 22, 2003.

[5] It appears that a total of seven offsets occurred on the following dates:

(1) $7,000.000 (January 22, 2003)
(2) $12,500.00 (January 22, 2003)
(3) $9,757.95 (January 22, 2003)
(4) $2,666.66 (January 22, 2003)
(5) $10,500.00 (February 10, 2003)
(6) $25,000.00 (May 14, 2003)
(7) $63,660.82 (November 5, 2003)

(Moore Dep. Ex. 1 at 2.)

According to DOT, however, it does not owe American Club any portion of the shortfall because the Club breached its fiduciary duty by agreeing to the $2,170,000 Tug Allie B settlement, when it could have settled with Allied for less and "months earlier when HIH was still solvent." (Dann Aff. ¶ 13.) DOT argues that it initially sought to have its current attorneys defend against the Tug Allie B claims, but that American Club insisted on appointing Mosley, Warren, Prichard & Parrish ("MWPP") of Jacksonville, Florida, to defend the claims.[6] (*Id*. at ¶ 5.) Subsequently, contends DOT, American Club and MWPP failed to accept a settlement with Allied for approximately $700,000 to $800,000, an amount Rodney Dann, the owner and president of DOT, states that Mr. Law of Allied told him Allied would be willing to accept in July 2001. (*Id*. at ¶ 9.) According to Mr. Dann, American Club refused to settle for this amount because of the impact on the suit brought by the United States. (*Id*. at ¶ 10.) DOT also argues that in an August 20, 2001, letter to American Club, MWPP mentioned a possible settlement with Allied in the $600,000 to $700,000 range.[7] (*Id*. at ¶ 11.) DOT contends that American Club's failure to settle the Allied claims in this range was particularly damaging because Allied eventually refused to do business with DOT due to the delay in addressing Allied's claims. (Dann Aff. ¶ 8 & Ex. C.)

---

[6] Apparently there was an agreement between DOT's towage underwriters and American Club that the Club would control the defense of both the United States's and Allied's claims. (*See* Defs.' Summ. J. Mem. at 15.)

[7] The letter stated in relevant part:

> In my last conversation with Gene O'Connor, we batted around some numbers. He was not committed to any particular number; but for some reason we discussed a figure for Allied's settlement in the neighborhood of $700,000. This is in any event a figure somewhat like the $600,000 that I at one time discussed with David McCreadie, although I never received a commitment from Allied's counsel concerning this type of figure.

(Dann Aff. Ex. E at 3.)

5

It is American Club's position, on the other hand, that it had final authority on when and for how much to settle claims against DOT. In support of its argument, the Club cites Club Rule 1 § 13 (*see* Pl.'s Summ. J. Mem. Ex. 2 at 22 (stating that a "Member shall neither settle nor make any admission in respect of liabilities, costs or expenses for which it is insured without the prior written consent of the Association")), and also cites an August 30, 2001, letter from DOT to the Club, which stated that with respect to claims where security was provided by the Club on behalf of DOT, we "irrevocably grant [the Club] authority to act on our behalf and to prosecute, defend and/or settle any claim or proceedings against us . . . in your absolute discretion in respect of the claim for which security of any kind . . . has been provided on our behalf." (Pl.'s Reply Ex. B.) The Club further argues that it could not have settled sooner than it did because no firm settlement demand had been made by Allied. Moreover, the Club contends that it could not have settled before HIH became insolvent, because HIH stopped paying all claims on March 16, 2001 (*see id*. Ex. C at 4), and full documentation from Allied about its property damage claim was not received by DOT's counsel until March 19, 2001. (*See* Dann Aff. Ex. B at 1-2.) American Club also argues that DOT's counsel did not receive full documentation about Allied's loss of use claim until March 28, 2001, but no evidence has been presented on this issue.

II.     *Unpaid Premiums*

The second way in which American Club alleges DOT breached the contract between them was by failing to pay a total of $452,330.72 in premiums for the 1999, 2000, and 2001 policy years. According to the Club, beginning with invoices dated December 29, 2001 for supplementary calls for policy years 1999-2001 due in February, May, and August 2002, DOT began to violate the terms of the insurance contract by not paying its premiums. (Moore Aff. ¶

6

12.)[8] American Club alleges that, sometime around September 2002, DOT began paying premiums and assessments to its broker, Windward International ("Windward"), and Windward deposited these funds into a bank account it called the "call account." (*Id.*) Instead of forwarding these funds to the Club, as had been done in the past, Windward allegedly used the funds in the call account to reimburse DOT for claims. American Club asserts that Windward would submit DOT's claims to the Club for approval as to nature and amount, and when the Club gave preliminary approval, Windward would simply pay the claim to or on behalf of DOT out of the call account, rather than waiting for indemnity of DOT by the Club. (*Id.*)

DOT's position, however, is that American Club decided to stop paying claims to DOT following the Tug Allie B litigation because it believed it was owed money for the shortfall; as a result, DOT started paying its premiums into the call account with the Club's knowledge. DOT's claims subsequently were paid exclusively from the call account, and thus, according to DOT, it "received no services of any type from the American Club and the American Club did not pay any claims to Dann Ocean Towing following the ALLIE B settlement." (Dann Aff. ¶ 15.) In this way, argues DOT, it was not required to pay premiums for coverage it did not

---

[8] An August 12, 2005 fax from American Club to DOT, which appears in the record as an attachment to the deposition of Mr. Moore, included the following description of the allegedly unpaid premiums:

| Description | Date Due | Amount |
|---|---|---|
| 1999 Supplemental Call | February 20, 2002 | $63,135.83 |
| 1999 Release Call | June 18, 2002 | $78,919.82 |
| 2000 Supplemental Call | August 20, 2002 | $76,925.56 |
| 2000 Supplemental Call | November 20, 2002 | $76,925.56 |
| 2000 Release Call | June 18, 2002 | $76,925.53 |
| 2001 Supplemental Call | May 20, 2002 | $42,696.99 |
| 2001 Release Call | June 18, 2002 | $42,696.99 |
| | | |
| | **Total** | **$458,226.28** |

(Moore Dep. Ex. 1 at 2.) The court notes, however, that these numbers do not add up to $452,330.72, the amount American Club alleges DOT failed to pay in premiums. The parties have neither contested the accuracy of this list, nor explained the apparent discrepancy.

receive. DOT also notes that American Club did not cancel the policy even though it did not receive the invoiced premiums.

III. *Counterclaim*

In response to American Club's claims, DOT has filed a counterclaim alleging that the Club breached the insurance contract by failing to pay covered claims. DOT argues that American Club admits to not having paid any of DOT's claims after May 2002, because the Club professed to be offsetting a debt that was, and continues to be, disputed by DOT. According to DOT, the Club was not entitled to offset a disputed debt under Club Rule 4 § 8. Thus, DOT alleges that the Club breached the insurance contract by failing to indemnify DOT for $131,085.43 in claims it admits were payable to DOT.

DOT further alleges that, in addition to these funds, DOT submitted claims to American Club totaling $458,967.21, of which $336,638.26 were approved by the Club. (*See* Power Dep. Ex. 2.) Specifically, DOT asserts that American Club expressly approved $141,638.26 in claims, for which DOT was indemnified by Windward. Furthermore, DOT argues that it presented a claim to the Club in the amount of $195,000 for settlement of the "Merritt claim", and that Mr. Moore approved the settlement, which was achieved during a mediation at which he was present. Accordingly, DOT alleges it is entitled to an additional $336,638.26 plus interest and costs. American Club disputes the amount for which DOT did not receive reimbursement. (*See* Pl.'s Reply at 10.)

## ANALYSIS

I. *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## II.     Doctrine of Laches

DOT argues that American Club's claims are untimely. It is undisputed that this case is within the court's admiralty jurisdiction, *see* 28 U.S.C. § 1333, and that the contract at issue is a marine insurance contract. *See Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 601 (1st Cir. 1997) (explaining that "[m]arine insurance is defined as insurance with a subject matter specifically related to hazards encountered in maritime transportation, including the risks of river and inland

9

navigation"). In admiralty, the equitable doctrine of laches applies rather than a specific statute of limitations.[9] *See White v. Johns-Manville Corp.*, 662 F.2d 234, 240 (4th Cir. 1981), *overruled on other grounds by Oman v. Johns-Manville Corp.*, 764 F.2d 224 (4th Cir. 1985); *Asia N. Am. Eastbound Rate Agreement v. Pac. Champion Serv. Corp.*, 864 F. Supp. 195, 202 (D.D.C. 1994); *see also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law §§ 3-2 & 5-22 (4th ed. 2004).

Typically, to prevail in a doctrine of laches defense a defendant must show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Giddens v. Ibrandsten Co., Inc.*, 355 F.2d 125, 127 (4th Cir. 1966) (internal quotation marks and citation mitted). In other words, the existence of laches is determined by "a balancing of the claimant's delay with the proffered excuse, if any, against the defendant's consequent detriment." *Id*. Ultimately, the laches analysis involves a "weighing of equities." *Id*.

The statute of limitations applicable to analogous claims at law is instructive in the laches analysis. *Id*. at 128; *Randall v. Mayor & City Council of Baltimore*, 512 F. Supp. 150, 152 (D. Md. 1981). In admiralty cases, courts have held that whether the plaintiff files within the analogous statute of limitations affects the parties' burdens of proof with regard to the doctrine of laches. *See, e.g., Giddens*, 355 F.2d at 128; *TAG/ICIB Servs., Inc. v. Sedeco Servicio de Descuento en Comporas*, 570 F.3d 60, 63 (1st Cir. 2009). Specifically, if the plaintiff files within the analogous statutory period, the burden of proving delay and prejudice lies with the defendant, whereas if the plaintiff files outside the statutory period, the burden shifts and a

---

[9] DOT argues that because the contract between the parties included a choice of law clause designating New York law, the New York six-year statute of limitations applicable to contract claims, rather than the doctrine of laches, applies in this case. DOT has cited no case, however, in which a court sitting in admiralty jurisdiction applied a state law statute of limitations to a claim for breach of a marine insurance contract.

presumption of laches attaches. *See TAG/ICIB Servs.*, 570 F.3d at 63; *In re Consolidated Coal Co.*, 228 F. Supp. 2d 764, 768-69 (N.D.W.V. 2001) (citing *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985)).

But whether an analogous statute of limitations has run is not dispositive, *Ryan-Walsh, Inc. v. M/V Ocean Trader*, 930 F. Supp. 210, 214 (D. Md. 1996), because in admiralty cases laches "is not to be measured by strict application of statutes of limitations." *Id*. (internal quotation marks omitted) (quoting *Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 533 (1956)). Rather, "the determination should not be made without first considering all the circumstances bearing on the issue." *Id*. at 214-15 (internal quotation marks omitted) (quoting *Czaplicki*, 351 U.S. at 533). "In the end, laches is an equitable doctrine, within the sound discretion of the district court." *Doyle v. Huntress, Inc.*, 513 F.3d 331, 335 (1st Cir. 2008) (internal quotation marks and citation omitted).

American Club does not dispute that the analogous statutory period in this case is the New York six-year statute of limitations applicable to contract claims.[10] *See* NY CPLR § 213[2]. DOT argues that American Club's claim for the amount related to the Tug Allie B settlement shortfall accrued at the time of the Club's payment in December 2001, and that its claims for unpaid premiums accrued when each premium was due. Accordingly, DOT argues

---

[10] The choice of law clause in American Club Rule 1 § 15 provides in relevant part:

> These Rules and any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York. In no event shall suit on any claim be maintainable against the Association unless commenced within two years after the loss, damage or expense resulting from liabilities, risks, events, occurrences and expenditures specified under this Rule shall have been paid by the Member. Any such suit against the Association shall be brought in the United States District Court for the Southern District of New York.

(Pl.'s Summ. J. Mem. Ex. 2 at 23.)

that with the exception of the 2000 supplemental call, which became due on November 20, 2002, all of American Club's claims are untimely.

Under New York law, a cause of action in contract accrues from the time of the breach, when the "plaintiff possesses a legal right to demand payment." *TIG Ins. Co. v. Newmont Mining Corp.*, 413 F. Supp. 2d 273, 281 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). American Club does not dispute that its claim for the shortfall accrued in December 2001, six years and nine months before this case was filed (*see* Pl.'s Reply at 13-14), but it argues that there was neither unreasonable delay, nor prejudice to DOT, because from December 2001 until this case was filed the parties have "diligently and continuously sought to settle their claims outside of court." (*Id*. at 13.) The court agrees.

The record shows that the dispute over the shortfall began in late 2001 and has continued out of court ever since. Throughout this period, American Club attempted to recover the shortfall from DOT (*see, e.g.,* Moore Dep. Ex. 1 (describing a series of faxes between the parties and Windward regarding the shortfall dispute)), and DOT acknowledges that both immediately after American Club paid the settlement, and again in 2004, the parties unsuccessfully attempted to negotiate a settlement. (*See* Defs.' Opp'n at 12.) Moreover, beginning in 2003, American Club began offsetting the shortfall amount against DOT's claims in an effort to recover what it believed it was owed. American Club believed it had the power to do so under the Club Rules. Thus, American Club did not sit idly on its claim with regard to the Tug Allie B shortfall, but rather pursued various out-of-court means to get reimbursement from DOT. Under these circumstances, American Club's nine-month delay in filing suit was not unreasonable. *See, e.g., Chantier Naval Voisin v. M/Y Daybreak*, 677 F. Supp. 1563, 1570 (S.D. Fl. 1988) (finding no unreasonable delay where the plaintiff delayed filing suit because it "attempted to create a

mutually agreeable payment schedule by which the parties would avoid resolving th[e] dispute in court" and unsuccessfully tried to arrest the vessel).

Furthermore, although there is an inference of prejudice given the delay in filing suit, American Club has presented evidence sufficiently outweighing this inference. It is undisputed that DOT was aware of American Club's claim regarding the shortfall since at least the time of the settlement payment in December 2001. *See, e.g., Giddens*, 355 F.2d at 128 (finding no prejudice where the defendant "had notice of the accident immediately upon its happening"); *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1087 n.1 (5th Cir. 1982) (affirming district court's determination that suit by a dock owner for damages caused by a collision with defendant's vessel was not barred by laches even though the analogous state statute of limitations had run because the defendant was on actual notice of the plaintiff's claim within six months of the collision and "actual notice alone was sufficient to negate the possibility of prejudice to the defendant"); *TAG/ICIB Servs., Inc. v. Constructor Celta, Inc.*, 326 F. Supp. 2d 249, 254-55 (D.P.R. 2004) (finding there had been no unreasonable delay or prejudice where the "evidence show[ed] that the defendant received notice of the amounts claimed immediately after each of the freight demurrage invoices were issued and continuously thereafter through [the plaintiff's] collection efforts"). Moreover, there is nothing in the record suggesting that the delay has prevented DOT from gathering evidence or ably defending itself in this case. *See Giddens*, 355 F.2d at 128 (finding no prejudice where the defendant had possession of the names of local witnesses and relevant medical records). Although DOT argues that it has been prejudiced because interest has accrued on the Tug Allie B shortfall, DOT is as much responsible for any accrual of interest as the Club because it failed to reimburse American Club for over six years. DOT further argues that it has been prejudiced because American Club has not paid its claims

13

since 2002, but that failure is not directly the result of the Club's delay in filing suit. Rather, American Club appears to have ceased paying DOT's claims *after* DOT stopped paying its premiums. Accordingly, the equities in this case weigh against a finding of laches, and American Club's claim with regard to the Tug Allie B shortfall is not time-barred.[11]

### III. *Tug Allie B Settlement Shortfall*

DOT does not dispute that the Certificate of Entry and the American Club By-Laws and Rules formed a valid marine insurance contract between the parties, nor does it dispute that American Club was only required to provide insurance in excess of DOT's $1 million collision and towing policy with regard to Allied's claim in the Tug Allie B matter. Thus, besides asserting that American Club's claim is untimely, DOT's sole argument in support of its contention that it was not responsible for the shortfall amount is that the Club should have settled before HIH was insolvent and for a lesser amount. For the following reasons, however, this argument fails.

Unambiguous provisions of an insurance contract "must be given their plain and ordinary meaning." *White v. Cont'l Cas. Co.*, 878 N.E. 2d 1019, 1021 (N.Y. 2007). The "interpretation of such provisions is a question of law for the court." *Id*. Here, by not arguing otherwise, DOT essentially has conceded that pursuant to Club Rule 1 § 11, American Club was not liable for any loss or expense against which DOT was insured under other existing insurance, regardless of whether "that other insurance does not or is not able to respond to a claim thereunder." (Pl.'s Summ. J. Mem. Ex. 2 at 22.) Rule 1 § 11 cannot be interpreted otherwise. In addition, DOT has conceded that the stated limit for its collision and tower's liability insurance was $1 million.

---

[11] The court will not address the timeliness of American Club's claim for unpaid premiums at this stage because, as will be explained below, the factual record before the court is not sufficiently developed.

Accordingly, as a matter of law, American Club was liable only for costs associated with the Allied settlement above $1 million; it is undisputed that the Club paid those excess costs. (*See* Moore Aff. ¶ 10.)

In addition to its obligations in the Tug Allie B settlement, American Club also paid $278,552.55 to cover the shortfall caused by HIH's inability to pay. When American Club "advanced" these funds, the parties reserved their rights with regard to legal responsibility for the shortfall. (*See* Solarino Dep. Ex. 4 & 6.) American has now filed suit to determine that responsibility. That DOT did not consent to a loan agreement with American Club does not mean DOT is not legally obligated to pay for the shortfall. Rather, the plain terms of the contract between the parties show that American Club has no responsibility for this amount. While it is unfortunate for DOT that HIH went into receivership and was unable to pay its portion of the settlement, there is nothing in the contract to suggest the risk of such an event was to be borne by the Club rather than DOT.

Furthermore, there is simply no evidence in the record from which a reasonable juror could conclude that American Club refused to accept a lower settlement with Allied, therefore somehow leaving the Club legally responsible for the shortfall. DOT hardly disputes that under Club Rule 1 § 13, the Club had full authority to settle claims on behalf of DOT.[12] Rather, DOT contends that as an insurer representing DOT, American Club breached its duty of good faith by not settling earlier. But even assuming without deciding that a fiduciary relationship existed between the parties, DOT has presented no evidence from which it could reasonably be inferred that an offer of settlement for less than $1,100,000 had been made by Allied and rejected by

---

[12] DOT disputes the applicability to this case of the August 30, 2001 letter from Mr. Dann to American Club granting the Club authority to act on its behalf with regard to claims for which security had been provided by the Club. (*See* Pl.'s Reply Ex. B.) The Club's authority is clear, however, even without the letter.

15

American Club prior to HIH's bankruptcy. DOT relies exclusively on an unsupported statement by Mr. Dann that someone at Allied told him in July 2001 that Allied would be willing to accept $700,000 to $800,000 (*see* Dann Aff. ¶ 9), and an August 2001 letter from MWPP to American Club which mentioned a settlement in the "neighborhood of $600,000" but explicitly stated that as of that date Allied was not committed to any particular number. (*Id*. Ex. E at 3.) Such vague statements cannot support a finding that American Club breached a duty to DOT by refusing to settle with Allied for less than it ultimately did. Furthermore, the only evidence before the court indicates that HIH stopped paying all claims in March 2001, suggesting that these supposed settlement offers occurred *after* HIH was insolvent. It also appears that DOT's counsel did not even receive documentation regarding Allied's property damage claim until March 19, 2001[13] (*see* Dann Aff. Ex. B at 1-2); it is likely, therefore, that a shortfall was inevitable.

Accordingly, DOT, and not American Club, is legally responsible for the shortfall of $278,552.55. The Club has already offset $131,085.43 of this amount, as it contends the plain language of the Club Rules allowed it to do.[14] The Club, therefore, is entitled to summary judgment on its breach of contract claim for the remainder of the Tug Allie B settlement

---

[13] DOT has not disputed American Club's assertion that DOT's counsel did not receive documentation of Allied's loss of use claim until March 28, 2001. Because no evidence has been presented on this issue, however, the court will not rely on it.

[14] Club Rule 4 § 8 allows American Club to offset "any amount due from a Member against any amount due to such Member from the Association." (Pl.'s Summ. J. Mem. Ex. 2 at 48.) DOT contends that "due" should be interpreted as requiring that any debt be agreed upon before an offset is allowed. In support of its argument, DOT relies exclusively on the testimony of George Tsimis, the general counsel for American Club, that the determination of whether an amount is due is not "without any input from the member," and that American Club is "not in the business of unilaterally and unlawfully deducting amounts of monies owed to the Club or vice versa." (Defs.' Opp'n at 7 (citing Tsimis Dep. at 24: 6-16).) As a preliminary matter, DOT has not presented a transcript of Mr. Tsimis's deposition to the court. But even Mr. Tsmis's testimony does not alter the fact that the plain meaning of the word "due" does not necessarily require a complete absence of dispute surrounding a debt. In any event, DOT will be given credit in this ruling for the amount of the "offset."

16

shortfall.

IV.     *Unpaid Premiums and Unpaid Claims*

The facts pertaining to American Club's claim for unpaid premiums and DOT's counterclaim for unpaid claims, however, are not sufficiently developed for the court to rule on the parties' motions for summary judgment at this time. It is not clear precisely which premiums were unpaid, nor which claims were approved, yet unpaid. The role of the court is not to comb through the record piecing together the facts and timeline of the parties' claims. Accordingly, the court will deny the parties' motions for summary judgment as to the unpaid premiums and claims without prejudice. Counsel will be contacted to schedule further briefing or other proceedings to resolve the remainder of the case.

## **CONCLUSION**

For the reasons stated above, American Club's motion for summary judgment as to the Tug Allie B settlement shortfall will be granted. The parties' motions for summary judgment otherwise will be denied. A separate Order follows.


    August 30, 2010                                   /s/
        Date                                          Catherine C. Blake
                                                     United States District Judge