IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS : <br> MUTUAL PROTECTION AND : <br> INDEMNITY ASSOCIATION, INC. : <br> : Civil No. CCB-08-2195 <br> v. : <br> : <br> DANN OCEAN TOWING, INC., *et al*. : <br> : | |

...o0o...

**MEMORANDUM**

In July 1998, a tugboat ran aground on a coral reef in Biscayne National Park in Florida. The tug operator, Dann Ocean Towing, Inc., and its subsidiary, Dann Towing Company (collectively "DOT"), conceded liability. One of DOT's underwriters, however, went into receivership and could not pay its portion of DOT's settlement for damage to the barge the tug was towing at the time, leaving a shortfall. DOT took the position that its excess insurer, the American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the American Club" or "the Club"), was liable for the shortfall. The Club disagreed. In this court's earlier opinion, the court concluded that DOT, not the Club, bore the loss from the shortfall when HIH could not pay. *See Am. Steamship Owners Mutual Prot. & Indem. Assoc., Inc. v. Dann Ocean Towing, Inc.*, 2010 WL 3447651, *8 (D. Md. Aug. 30, 2010) ("*Steamship I*"). The dispute over the shortfall, however, spawned a series of related disputes. With the Club arguing that DOT must pay for the shortfall, DOT refused to pay its premiums, and the Club refused to reimburse DOT for claims, instead offsetting those claims against the premiums DOT was refusing to pay. Those related disputes are the subject of the cross-motions for summary judgment currently pending before this court. The motions have been fully briefed and no oral argument is necessary. For the reasons set forth below, both motions will be denied.

1

**BACKGROUND**

In *Steamship I*, the court described many of the facts underlying the disputes between the Club and DOT, and will assume familiarity with that opinion. The following are the facts from that opinion relevant to the remaining disputes, along with those supported by additional evidence the parties have submitted since then. Unless otherwise noted, they are undisputed.

*The Insurance Policies*

The American Club is a non-profit mutual protection and indemnity ("P & I") association that provides marine insurance to ship owners, their managers, and charterers against third-party liabilities encountered in their commercial operation of vessels. Its members fund the Club's operations and coverages through various types of premiums, or "calls."[1] DOT, which manages and operates a fleet of tugboats, was a member of the Club from 1995 to 2001. Seven vessels were covered by DOT's policies with the Club. (Certificate of Entry, ECF No. 76-1 at 1.)[2]

The terms of the insurance coverage DOT received from the Club were articulated in the By-Laws and Rules of the Association. (*See* By-Laws and Rules of the American Steamship Owners Mutual Protection and Indemnity Association, Inc., Rule 1 § 2, ECF No. 89-2 at 21 ("Each Member of the Association shall be insured by the Association in accordance with the application for membership and/or entry of a vessel in the Association, and with these Rules and By-Laws of the Association . . ."); Rule 1 § 3, *id.* ("An application by a Member . . . shall, upon acceptance by the Association, constitute an agreement by the applicant to take insurance in the Association as described in the agreement . . .").) The Rules include the following choice-of-law

---

[1] The Club issues several types of "calls," including initial calls, paid on February 20 of each year; supplemental calls, which are issued if the Club's payments of claims in a given policy year exceed the members' initial calls for that policy year; and release calls, which are issued upon the termination of coverage for a vessel. The distinctions between these types of calls are immaterial to this dispute.

[2] In light of the numerous submissions from the parties, exhibits will be cited as their ECF designation. Page numbers refer to the numbers assigned by the ECF system.

clause: "These Rules and any contract of insurance between the Association and a member shall be governed by and construed in accordance with the law of the State of New York." (Rule 1 § 15, *id.* at 27.) The Rules also provide a two-year contractual limitations period for lawsuits against the Club. (Rule 1 § 15, *id.* ("In no event shall suit on any claim be maintainable against the Association unless commenced within two years after the loss, damage or expense resulting from liabilities, risks, events, occurrences and expenditures specified under this Rule shall have been paid by the Member.").)[3] The contract does not specify a limitations period for suits by the Club to collect premiums or other payments from members.

*The Shortfall and its Consequences*

The July 1998 grounding in Florida resulted in a $2,170,000 settlement: $1,070,000 to the United States government for injury to the reef, and $1,100,000 to Allied Towing, Inc. for injury to its barge, which DOT was towing at the time.[4] The Club conceded that DOT's liability to the United States was fully covered by DOT's P & I policy with the Club and that $100,000 of DOT's liability to Allied (*i.e.*, the amount over $1 million) was covered by its excess insurance policy, and paid out for those claims. The remaining $1 million was covered by DOT's policy with St. Paul Fire & Marine, which was underwritten by several underwriters, including HIH International. HIH went into receivership and could not pay its portion of the $1 million owed to Allied, leaving a shortfall of $278,552.55. (*See* Affidavit of Rodney Dann ("Dann Aff."), ECF No. 75-1, ¶13.) DOT refused to pay the shortfall, claiming that the Club should pay. The Club denied responsibility for paying the shortfall, arguing that if the bankrupt HIH could not pay, DOT must bear the loss. In November-December 2001, in order to preserve an "extremely favorable settlement" offer from Allied, the Club and DOT agreed that the Club would "loan the

---

[3] This contractual limitation has not been raised as an issue in this case.
[4] The Eleventh Circuit described the grounding and addressed the extent of DOT's liability to the United States in *Tug Allie-B, Inc. v. United States*, 273 F.3d 936 (11th Cir. 2001).

3

necessary funds to DOT," but each maintained that the other was liable. (Affidavit of Donald Moore (Nov. 12, 2009) ("Moore Aff. 1"), ECF No. 64-3, ¶10.)

By that time, DOT's membership in the Club had come to an end, its membership having concluded when the Club refused to renew its membership for the 2002-2003 policy year. (Deposition of Vincent Solarino (Oct. 8, 2009), ECF No. 75-6 at 6:23-7:7.) But despite no longer being a member, it remained liable for outstanding premiums, including calls issued after DOT's membership ended, if those calls were for policy years during which DOT had been insured by the Club. DOT apparently continued to pay the premiums that came due during 2001. But beginning in February 2002, after the Club refused in late 2001 to absorb the loss of the HIH shortfall, DOT stopped paying its premiums to the Club. The premiums that DOT owed and did not pay the Club were the following:

| Date Due/Call | Amount |
| --- | --- |
| Feb. 20, 2002 (1999 Supplemental Call) | $63,135.83 |
| May 20, 2002 (2001 Supplemental Call) | $42,696.99 |
| June 18, 2002 (1999 Release Call) | $78,919.82 |
| June 18, 2002 (2000 Release Call) | $76,925.53 |
| June 18, 2002 (2001 Release Call) | $42,696.99 |
| Aug. 20, 2002 (2000 Supplemental Call) | $76,925.56 |
| Nov. 20, 2002 (2000 Supplemental Call) | $76,925.56 |

(Fax from Donald Moore to Rodney Dann (Aug. 12, 2005), ECF No. 89-4 ("August 2005 Moore Fax") at 6.) When a credit to DOT and an adjustment are taken into account (neither of which is disputed), the total amount DOT owed on its premiums, net of commission and pre-interest, is $452,610.23. (Affidavit of Donald Moore (Nov. 22, 2010) ("Moore Aff. 2"), ECF No. 89-4, ¶9.) DOT does not dispute this amount; indeed its broker admitted the amount on August 15, 2005. (*See id.* ¶11 (quoting a letter from Windward International to the Club stating the call amounts as $452,610.23, and stating that the amount "agree[s] with our records to the penny, so no dispute there").)

4

In or around September 2002, by which point the first six premiums were already overdue, DOT began paying a portion of the calls that had come due. But it did not pay them to the Club. Rather, it set up a "call account" with Windward International, the insurance broker through which DOT had arranged the P & I coverage by the Club. (*See* Defs.' Mem., ECF No. 90-1 at 5; Deposition of Joseph F. Cacici ("Cacici Dep."), ECF No. 75-3 at 7-8; Dann Aff., ECF No. 75-1, ¶15; Moore Aff. 1, ECF No. 64-3, ¶¶12-13.) Under this arrangement, DOT would pay into the call account the premiums it owed to the Club. Although DOT concedes that the Club did not "agree[]" to this arrangement with Windward, the Club was aware of it. (Cacici Dep., ECF No. 75-3 at 13-14; *see also* Moore Fax, ECF No. 89-4 at 5.) Of the $452,610.23 in premiums DOT never paid the Club, DOT paid $175,146.70 to Windward. (DOT Perspective, Exhibit to Deposition of Rick Power, ECF No. 75-5 at 38.) The parties continued to negotiate over DOT's repayment of the shortfall, but were unable to reach an agreement.

*DOT's Claims*

Throughout this time, DOT continued to submit claims to the Club, the Club continued to process the claims and, when a claim was covered by one of DOT's policies, the Club approved the claims. The Club did not reimburse DOT for any of those claims, however, including those it approved. Rather, in January 2003, the Club began offsetting the Allied shortfall against DOT's claims for reimbursement. DOT would submit a claim to the Club and if the Club approved the claim, instead of indemnifying DOT, it would decrease the balance of what DOT owed the Club on the shortfall. DOT obviously did not like that solution. It continued to believe that it was not liable for the Allied shortfall, and that by refusing to indemnify it on its claims, the Club was breaching the Rules, both because (1) the Club was liable for the shortfall, and (2) even if the Club was not liable for the shortfall, the Club was not entitled to offset the shortfall against

5

subsequent approved claims. Thus DOT turned to Windward for reimbursement. For claims DOT submitted to the Club and the Club approved, Windward would reimburse DOT from the call account. (Dann Aff., ECF No. 75-1, ¶15.) Thus by early 2003, DOT had ceased paying its premiums to the Club and the Club had ceased reimbursing DOT even for indisputably covered claims—hence the dispute that has been simmering since that time. The details of DOT's claims for indemnification are discussed below.

*Procedural History*

The Club filed this lawsuit on August 21, 2008, alleging breach of contract and seeking to recover (1) the amount of the shortfall and (2) the amount of premiums DOT owed and had not paid. The Club also moved for issuance of a warrant for arrest and writ of maritime attachment and garnishment against the CAPTAIN DANN against which to enforce a potential judgment. This court granted the motion and denied DOT's subsequent motion to quash, vacate, and set aside the maritime attachment and garnishment. (*See* ECF Nos. 39-40.) DOT counterclaimed, also for breach of contract, seeking indemnification on the claims covered by its insurance policies.

In *Steamship I*, this court held that, with respect to the original dispute over the shortfall, the Club was in the right—DOT, not the Club, was liable for the shortfall. 2010 WL 3447651 at *8. In reaching that conclusion, the court held that the timeliness of the Club's claims for unpaid premiums was governed by the doctrine of laches, not the New York statute of limitations. *Id.* at *5.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

### I. Motions for summary judgment

In *Steamship I*, this court held that the timeliness of the Club's claim for the shortfall is governed by the maritime doctrine of laches, not the New York statute of limitations. 2010 WL 3447651 at *5. DOT objects to that conclusion, pointing to the choice-of-law clause in the Rules designating New York law as governing the contract. DOT argues that because (1) choice-of-

7

law clauses in maritime contracts are enforceable, *see Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 413 (4th Cir. 2009); *see also Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242-44 (5th Cir. 2009); *Flores v. American Seafoods Co.*, 335 F.3d 904, 916 (9th Cir. 2003); Rest. (2d.) of Conflict of Laws § 187 (1971), (2) choice-of-law clauses incorporate the statute of limitations of the chosen state's law, *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151 (9th Cir. 2009); *Wang Labs., Inc. v. Kagan*, 990 F.2d 1126, 1128 (9th Cir. 1993), and (3) under New York law breach-of-contract claims must brought within six years, *see* N.Y. C.P.L.R. § 213(2), the Club's claims for the shortfall and unpaid premiums are untimely. DOT also argues that even if there were no choice-of-law clause, or in the event the clause were held unenforceable or inapplicable, New York law would still govern the timeliness of the parties' claims. (*See* Defs.' Mem., ECF No. 90-1 at 8-10 (citing *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314 (1955)).)

The extent to which the parties dispute or do not dispute the facts underlying the various claims is now apparent. On the Club's claim for the shortfall, there is no genuine issue of material fact that DOT was liable for the shortfall, the amount of the shortfall was $278,552.55, and it accrued in December 2001, six years and nine months before this case was filed. *Steamship I*, 2010 WL 3447651 at *6. With respect to the Club's claim for unpaid premiums, it is undisputed that (1) beginning with premiums due on Feb. 20, 2002, there were seven calls, totaling $452,610.23 (net of commission and pre-interest), that DOT owed but never paid the Club; (2) all but the call due Nov. 20, 2002, for $76,925.56, came due more than six years before this suit was filed; and (3) of the $452,610.23 in premiums DOT never paid the Club, DOT paid $175,146.70 to Windward.

With respect to DOT's claims for indemnification, the facts are discernible from the

8

record and the briefs. During the period of dispute about the shortfall—during which DOT did not pay its premiums and the Club applied indemnity payments toward the shortfall—DOT submitted claims arising out of incidents on five of its tugboats: the ALLIE B, the NEPTUNE, the STEPHANIE DANN, the RUBY M, and the CAPTAIN DANN. The claims totaled $458,967.21. (DOT Perspective, ECF No. 75-5 at 38.) DOT concedes that of this amount, $122,328.95 in claims was not "expressly approved" by the Club. (Defs.' Resp., ECF No. 75 at 22 n.6.)[5] Thus the parties agree that there are genuine issues of material fact with respect to at least $122,328.95 of DOT's claims. (*See* Defs.' Resp., ECF No. 75 at 21; Pl.'s Reply, ECF No. 91 at 7-8, 10.) With respect to an additional $141,638.26 in claims, the record is unclear as to whether the Club is disputing that it approved those claims.[6] But whether the parties dispute those claims is immaterial, because DOT received reimbursement from Windward out of the call account for those claims and therefore this amount would be deducted from any eventual amount DOT would otherwise be entitled to recover from the Club.

With respect to DOT's remaining $195,000 claim for indemnification, the Club disputes DOT's contention that the Club approved that claim. (*See* Pl.'s Reply, ECF No. 91 at 9-10.) The approval of claims is governed by Club Rule 1 § 14, which provides, "The Association shall not be liable for any claim not presented to the Association with proper proofs of loss within one year after payment by the Member." (ECF No. 89-2 at 27.) The Club argues that DOT has not shown that it satisfied Rule 1 § 14 because the deposition of Donald Moore, who attended a mediation related to the Merritt claim on behalf of the Club, is insufficient to demonstrate that

---

[5] This figure consists of $40,934.50 in indisputably unapproved claims arising out of the Bowen (RUBY M) incident, and $81,394.45 in indisputably unapproved claims arising out of the Merritt (CAPTAIN DANN) incident. (DOT Perspective, ECF No. 75-5 at 38.)
[6] These claims include $25,770.33 on the Bowen (RUBY M) claim, $66,327.48 on the Merritt (CAPTAIN DANN) claim, $34,757.95 on the Loeser (NEPTUNE) claim, $12,500 on the Maldonado (STEPHANIE DANN) claim, and $2,282.50 on the ALLIE B grounding claim. (*See* DOT Perspective, ECF No. 75-5 at 38.)

the Club approved the claim.[7] The deposition does appear to be insufficient standing alone, because Rule 1 § 14 required DOT to present to the Club "proper proofs of loss," which it could not have done until *after* the mediation concluded and DOT paid the settlement, thereby incurring a loss. But DOT is not relying solely on the Moore deposition as evidence that the Club approved the $195,000 claim. Rather, DOT also relies on two additional documents. On April 21, 2005, Joseph Cacici at Windward sent a fax to Donald Moore at the Club that stated, in relevant part:

> Enclosed please find confirmation of transfer of $195,000 from Dann Ocean to Fowler White Trust A/C/ in connection with the agreed settlement in the [Merritt] case. As such, please confirm so we can add to our listing of agreed claims.

(ECF No. 90-2 at 6). Accompanying the fax was a copy of a Wire Transfer Request for $195,000. (*Id.* at 7.) On August 12, 2005, the Club responded to the April 21 Cacici fax and described the Club's understanding of the status of DOT's claims and offsets. (Moore Fax, ECF No. 89-4 at 6.) The fax states in relevant part, "Dann Ocean Towing settled the claim for $195,000, and we can offset that as well," and later listed the $195,000 as an offset claim. (ECF No. 89-4 at 6.) The Club's response can only mean that the Club had received the Cacici fax and had approved the claim; the Club would not have agreed to decrease the amount DOT owed on the shortfall by $195,000 unless it had concluded that the claim was covered by DOT's policy with the Club. The Club does not point to anything in the record that contradicts the evidence

---

[7] The relevant portion of the Moore deposition is the following:
    Q: Would you remember attending a mediation for Merritt?
    A: Yes, I do.
    Q: Okay. And do you remember that at the mediation there was a settlement?
    A: Yes.
    Q: And did you approve that settlement?
    A: On behalf of The Club, yes.
    Q: And that was for $195,000?
    A: According to what I see here, yes.
    Q: Okay. Do you have any reason to doubt that?
    A: No.
(Donald Moore Dep. (Oct. 8, 2009), ECF No. 75-4 at 8.)

that DOT presented proof of loss and the Club approved the claim. Therefore, on this claim for indemnification, there is no genuine issue of material fact.

In addition to the partial dispute on the indemnification claim, the court is still not in a position to definitively rule on the parties' motions for summary judgment because there are two legal doctrines that appear to be relevant to this case, but which the parties have not addressed: equitable estoppel and recoupment. Even if New York law applies to the parties' claims, these doctrines might affect claims that would otherwise be untimely.

First, under New York law, a defendant may be estopped from raising a statute-of-limitations defense if the defendant "engaged in any affirmative misconduct, i.e., fraud, misrepresentation, or deception, to induce [the plaintiff] to refrain from filing a timely action." *Nowacki v. Becker*, 897 N.Y.S.2d 560, 561 (N.Y. App. Div. 2010). The plaintiff must show that the defendant "intended to lull the [plaintiff] into inactivity and to induce [the plaintiff] to continue negotiations until after the Statute of Limitations had run." *Allstate Ins. Co. v. Schelter*, 720 N.Y.S.2d 685, 686 (N.Y. App. Div. 2001); *see also Grumman Corp. v. Travelers Indem. Co.*, 733 N.Y.S.2d 464, 466 (N.Y. App. Div. 2001) (rejecting a plaintiff's estoppel argument where the plaintiff did not show that the defendant had "lulled the plaintiff into sleeping on its rights under the insurance policy because it offered to settle the claim"). Equitable estoppel is based on notions of reasonable reliance. *Triple Cities Constr. Co. v. Maryland Casualty Co.*, 151 N.E.2d 856, 859 (N.Y. 1958).

Second, also under New York law, if two parties to a contract each allege that the other breached the contract, and if one party's claim is barred by the statute of limitations and the other's claim is not, the untimely claim "is not barred [by the statute of limitations] to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted

11

in the complaint were interposed." N.Y. C.P.L.R. § 203(d). Thus "claims and defenses that arise out of the same transaction as a claim asserted in the complaint are not barred by the Statute of Limitations, even though an independent action by defendant might have been time-barred at the time the action was commenced." *Bloomfield v. Bloomfield*, 764 N.E.2d 950, 952 (N.Y. 2001). "The provisions of CPLR 203(d) allow a defendant to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint, but only as a shield for recoupment purposes, and does not permit the defendant to obtain affirmative relief." *Carlson v. Zimmerman*, 882 N.Y.S.2d 139, 141 (N.Y. App. Div. 2009).

Because the court has thus far determined that the New York statute of limitations does not apply, the parties have not raised arguments concerning either of these doctrines. In light of the continued dispute about the applicability of New York law, however, the court will need to address whether a finding of equitable estoppel would be justified on the facts here, or whether the recoupment doctrine would apply to one or more of the Club's claims.[8] Accordingly, the parties will be requested to address these potentially applicable doctrines in connection with any trial in this case.

## II. The Club's motions to increase and decrease security

The Club has moved to increase the amount of the bond DOT must post to guarantee any judgment entered against the CAPTAIN DANN because, according to the Club, "$500,000 is insufficient security to guarantee payment of the Club's claims with interest." (ECF No. 92-1 at 1.) The Club has also moved to decrease the security it must provide to guarantee payment of a judgment in favor of DOT, arguing that the amount of DOT's counterclaims as they currently stand is less than the current amount of the bond. (ECF No. 93-1 at 1-2.) As noted above,

---

[8] For example, even if the Club's claims for "affirmative relief" on the shortfall and/or all but the last call are barred by the statute of limitations, that would not prevent the Club from using the untimely claims as a "shield for recoupment purposes." *Carlson*, 882 N.Y.S.2d at 141.

questions remain about whether either party ultimately will recover damages on its claims, and, if so, the amount of any potential judgment. Accordingly, both motions will be denied.

## **CONCLUSION**

For the reasons stated above, the parties' motions for summary judgment and the Club's motions concerning security will be denied. A separate Order follows.

<u>Aug. 8, 2011</u>  /s/
Date  Catherine C. Blake
  United States District Judge